**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| CS DIAGNOSTICS, CORP.,<br>Plaintiff, | §<br>§<br>§ | |
| v. | § | Civil Action No. 3:25-cv-01158-N-BN |
| | § | |
| LUKE WILSON,<br>Defendant, | §<br>§<br>§ | |
| and | §<br>§ | |
| TRANSFER ONLINE, INC.,<br>Interested Party. | §<br>§ | |

**PLAINTIFF'S SECOND AMENDED VERIFIED COMPLAINT**

Plaintiff CS Diagnostics, Corp. ("CSDX" or "Plaintiff") files this Second Amended Verified Complaint pursuant to the Court's Order of July 30, 2026 (Dkt. No. 64) and respectfully shows the Court as follows. The factual allegations of this Complaint are verified by the Declaration of Mohammad Salah Al Sayyed, Plaintiff's Vice President and Chief Financial Officer, who is known in business correspondence as Mohammad Essayed (the "Al Sayyed Declaration" or "Al Sayyed Decl."), filed with it, and the exhibits cited below are the exhibits to that Declaration.

## I. PARTIES

1. Plaintiff CS Diagnostics, Corp. is a corporation organized under the laws of the State of Wyoming. Its address of record in its filings with the Securities and Exchange Commission is 1603 Capitol Avenue, Suite 413, Cheyenne, Wyoming 82001, and it maintains offices at Stresemannallee 4c, 41460 Neuss, Germany. Plaintiff's common stock is quoted in the United

States on the OTCQB market operated by OTC Markets Group Inc. under the ticker symbol CSDX.

2. Defendant Luke Wilson ("Wilson" or "Defendant") is a citizen of the United Kingdom. During the events described in this Complaint, Defendant resided in Dubai, United Arab Emirates, where he identified himself in his agreements by his United Arab Emirates identification number and his Dubai residential address. The address of record for Defendant's account with Plaintiff's transfer agent is in Nottingham, United Kingdom, and Defendant has since represented to the Circuit Court of the State of Oregon that he resides in Barcelona, Spain. Defendant is not a resident of any State of the United States. Defendant is the founder of Ounce Sachs LLC ("Ounce Sachs"), which describes itself as the Wilson family's global investment holding company located in the Dubai International Financial Centre. (Al Sayyed Decl. Exs. A, C, P, U, W.)

3. Transfer Online, Inc. ("Transfer Online") is an Oregon corporation with its principal office at 512 SE Salmon Street, Portland, Oregon 97214. Transfer Online is Plaintiff's United States transfer agent and holds, maintains, and processes the records of Plaintiff's issued shares, including the shares held by Defendant in book-entry form under Account No. 1246-026. Transfer Online is identified as an Interested Party because the declaratory relief requested below concerns shares recorded on its books. Plaintiff asserts no claim against Transfer Online.

## II. JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, because Plaintiff asserts a claim arising under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

5. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's state-law claims because they arise from the same nucleus of operative facts as the federal claim: the same representations, the same securities transfers, and the same course of conduct.

6. Section 27 of the Exchange Act authorizes nationwide service of process. For purposes of the Fifth Amendment, the relevant forum for assessing Defendant's contacts is the United States as a whole.

7. After Defendant challenged personal jurisdiction, the Court authorized targeted jurisdictional discovery concerning Defendant's contacts with the United States, including interrogatories, requests for production, and requests for admission directed to Defendant. See Dkt. Nos. 39, 41. Plaintiff submitted the evidence obtained through that discovery in its Supplemental Jurisdictional Brief and Evidentiary Response. See Dkt. No. 48.

8. On review of that evidence, including Defendant's own admissions, the Magistrate Judge found that Plaintiff had presented evidence supporting its allegation that Defendant purposefully availed himself of the United States' financial and securities infrastructure and possessed sufficient minimum contacts with the United States for this action to proceed. See Dkt. No. 62 at 6 to 7. The District Court accepted those findings and recommendation, see Dkt. No. 63, and directed Plaintiff to file this Second Amended Complaint incorporating the facts developed through jurisdictional discovery. See Dkt. No. 64.

9. Venue is proper in this District under 28 U.S.C. § 1391(c)(3), because Defendant is not a resident of the United States and may be sued in any judicial district, and under 15 U.S.C. § 78aa. Defendant's prior requests for dismissal and transfer on jurisdictional and venue grounds were denied.

## III. FACTS ESTABLISHING DEFENDANT'S CONTACTS WITH UNITED STATES

10. CSDX is a United States corporation organized under Wyoming law whose securities are quoted and traded through the United States over-the-counter market.

11. CSDX's issued shares are held, recorded, and administered through Transfer Online in Portland, Oregon. Every transfer of CSDX shares into or out of book-entry form, including every transfer of Defendant's shares described below, was recorded on Transfer Online's books in Oregon.

12. Defendant acquired and held CSDX shares in book-entry form at Transfer Online under Account No. 1246-026 and repeatedly communicated with Plaintiff, Transfer Online, and brokerage representatives concerning the transfer, release, custody, and sale of those shares.

13. In the June 2024 Securities Purchase Agreement described below, Defendant acquired CSDX shares by a stock power directing Transfer Online to transfer the shares on the books of the corporation, and he stated his intention to place the shares with J.P. Morgan Private Bank under custodianship. (Al Sayyed Decl. Ex. A.)

14. In March 2025, Defendant sought the transfer of CSDX shares from Transfer Online into a brokerage account through which he could sell them. On March 21, 2025, Defendant sent the written commitment described below to Plaintiff's officers, copying Carolyn Hall of Transfer Online in Oregon, and Plaintiff's Chief Financial Officer responded by instructing Transfer Online to process the pending Direct Registration System ("DRS") request associated with Defendant's shares. (Al Sayyed Decl. Ex. J.)

15. Defendant thereafter caused CSDX shares to be sold in transactions executed through the United States over-the-counter market and cleared and settled through The Depository

Trust Company ("DTC") by its United States participants, first JPMorgan Chase Bank, N.A. and later The Bank of New York Mellon. (Al Sayyed Decl. Exs. F, M.)

16. In 2026, Defendant directed a formal demand to Transfer Online in Oregon seeking the release of the restriction on his 2,000,000 restricted CSDX shares, and then sued Transfer Online in the Circuit Court of the State of Oregon for the County of Multnomah over the same shares. (Al Sayyed Decl. Exs. T, U.)

17. Defendant's use of foreign brokerage intermediaries did not remove the United States components of these transactions. The securities were the shares of a United States issuer, maintained on the books of a United States transfer agent, sold into the United States over-the-counter market, and settled through United States clearing institutions.

18. Defendant's contacts with the United States therefore arise directly from the securities transactions and the conduct on which Plaintiff's claims are based. As the Court has found, requiring Defendant to defend this action in the United States does not offend the Fifth Amendment. See Dkt. Nos. 62, 63.

## IV. FACTUAL BACKGROUND

### A. CSDX, CS Interpharm, and MEDUSA

19. CS Interpharm General Trading LLC ("CS Interpharm") is a Dubai, United Arab Emirates company and an affiliate of Plaintiff. Thomas Fahrhoefer is the President and Chairman of Plaintiff and leads the group of companies that includes CS Interpharm. Mohammad Salah Al Sayyed, known in business correspondence as Mohammad Essayed and referred to in this Complaint as Plaintiff's Chief Financial Officer, is the Vice President and Chief Financial Officer of Plaintiff and the Managing Director and Group Chief Financial Officer of CS Interpharm.

20. CS Interpharm owns the intellectual property, trademarks, and related assets of MEDUSA SDP ("MEDUSA"), a surface disinfectant marketed under the MEDUSA name.

21. By an Exclusive License and Distribution Agreement dated as of January 2, 2025, CS Interpharm granted Plaintiff the exclusive right and license to use, import, market, promote, distribute, and sell MEDUSA in the United States and its territories for a term of ten years. Section 8.1 of that agreement gives Plaintiff the exclusive right, at its own expense, to enforce its rights against any third party that imports, markets, distributes, or sells the product in the United States without authorization or that otherwise interferes with Plaintiff's exclusive rights in the United States. Ownership of the MEDUSA intellectual property remains with CS Interpharm. The agreement has been filed with the Securities and Exchange Commission as Exhibit 10.3 to Plaintiff's registration statement on Form 10. (Al Sayyed Decl. Ex. V.)

**B. Defendant's Acquisition of CSDX Shares**

22. By a Securities Purchase Agreement dated as of June 19, 2024 (the "SPA"), Defendant acquired CSDX common shares from an existing shareholder, Grassar Holding BV. The SPA, which Defendant signed, recites that it was executed in reliance on an exemption from registration under the Securities Act of 1933, and in it Defendant represented that he was an accredited investor acquiring the shares for investment for his own account and would dispose of them only pursuant to a registration statement or an exemption under that Act. The SPA contemplated that the shares would be placed in DRS book-entry form in Defendant's name at Transfer Online before being assigned to J.P. Morgan Private Bank under custodianship. Defendant did not enter into the SPA, or any other securities purchase agreement, with Plaintiff. (Al Sayyed Decl. Ex. A.)

23. Defendant held his CSDX shares at Transfer Online under Account No. 1246-026 and, for trading purposes, in a brokerage account at Velocity Trade Financial Services (Pty) Ltd. ("Velocity Trade"), a South African broker-dealer whose CSDX transactions cleared through DTC participant JPMorgan Chase Bank, N.A. ("JPMCBNA").

**C. The MEDUSA Sale, the Settlement Agreement, and the Waiver**

24. By a memorandum of understanding executed in March 2024, Defendant and Mr. Fahrhoefer, described in that document as the "IP Inventors," sold the MEDUSA intellectual property and trademarks to CS Interpharm in exchange for, among other things, 1,000,000 CSDX shares. The Settlement Agreement described below recites that Defendant "sold all its rights in and for MEDUSA SDP" to CS Interpharm on March 31, 2024. (Al Sayyed Decl. Ex. O (enclosures); Ex. C at 1.)

25. During 2024, Defendant proposed to Mr. Fahrhoefer that he could commercialize MEDUSA by arranging sponsorship relationships with prominent European football clubs, forming subsidiaries to distribute MEDUSA in Spain and the United Kingdom, and performing related marketing activities, in exchange for cash compensation payable to Defendant personally. In reliance on that proposal, CS Interpharm caused a United Kingdom entity, Medusa UK Holding ("Medusa UK Holding"), to be formed for that purpose and gave Defendant control of its account at Revolut bank. Defendant did not deliver the arrangements he had proposed and, notwithstanding his prior sale, continued through Medusa UK Holding to assert claims of right, title, and interest in MEDUSA.

26. To resolve that dispute and foreclose any further assertion of claims by Defendant, Defendant and CS Interpharm entered into a written Settlement Agreement dated February 17, 2025 (the "Settlement Agreement"). Under the Settlement Agreement, Defendant agreed (a) to

transfer the approximately £18,000 then held in Medusa UK Holding's Revolut account to CS Interpharm by the end of April 2025; (b) to close that account or hand it over to CS Interpharm; (c) to "strictly avoid representing and claim of ownership, current or future, of MEDUSA SDP and all its related companies, partners, affiliates, brand, trademark, social media, assets and equity worldwide"; and (d) to sign a full waiver confirming the completion of the sale. (Al Sayyed Decl. Ex. C at 1 to 2.)

27. In exchange, and as the reciprocal consideration for Defendant's performance of those obligations, CS Interpharm agreed (a) to transfer 1,000,000 unrestricted CSDX common shares and 2,000,000 restricted CSDX common shares to Defendant's Transfer Online Account No. 1246-026 within seven days; (b) to assist with the documentation needed to remove the restriction on the 2,000,000 shares after the six-month holding period; and (c) to pay US $93,000.00 on or before March 25, 2025 to a J.P. Morgan (Suisse) SA account held in the names of Defendant and Allison Natasha Williamson ("Williamson"), a sum the Settlement Agreement describes as "settling the tranches agreed and Mrs. Allison Williamson's Salaries ended on 31st January 2025." (Al Sayyed Decl. Ex. C at 2 to 3.)

28. On the same day, Defendant executed a written "Waiver of all Rights for Medusa SDP and fulfilment of sales agreement" (the "Waiver"), in which he confirmed "the fulfilment and conclusion of the sales of Medusa SDP and all its rights and assets to CS Interpharm General Trading LLC" and stated: "I hereby, waive, release, and relinquish any and all claims, demands of ownership, current or future, of MEDUSA SDP and all its related companies, partners, affiliates, brand, trademark, social media, assets and any equity worldwide." (Al Sayyed Decl. Ex. C at 5.)

29. During the negotiation of the Settlement Agreement, Defendant represented to Plaintiff's officers that he intended to hold the CSDX shares to be delivered to him for a long

period of time. That representation was material to Plaintiff and to CS Interpharm. CSDX shares were thinly traded, approximately 9,000,000 shares were then held through DTC, and a block of 3,000,000 shares in the hands of a seller would overwhelm the market for the stock.

30. Unknown to Plaintiff, Defendant had already begun selling CSDX shares through his Velocity Trade account in or about January 2025, before and during the negotiation of the Settlement Agreement, and he did not disclose those sales. His sales in March and April 2025, described below, were the continuation of a liquidation that began in January 2025.

31. On February 24, 2025, Plaintiff, as the issuing company, executed Transfer Online's transfer and indemnification form authorizing the transfer of 1,000,000 unrestricted CSDX common shares (Book Entry 702) to Defendant's Account No. 1246-026, effectuating the first of the share obligations under the Settlement Agreement. (Al Sayyed Decl. Ex. C at 7.)

32. On March 25, 2025, CS Interpharm transferred 2,000,000 restricted CSDX common shares from its own holdings at Transfer Online (Account No. 1123-181) to Defendant's Account No. 1246-026, where they were recorded as Book Entry 733, restricted under Rule 144, with a date of issue of March 25, 2025. Because Defendant acquired those shares from an affiliate of the issuer, they are restricted securities, and Defendant's holding period under Rule 144 began on March 25, 2025. (Al Sayyed Decl. Ex. W.)

33. Plaintiff authorized the February 24, 2025 transfer, and CS Interpharm delivered the 3,000,000 shares, in reliance on Defendant's representation that he intended to hold them for a long period and without knowledge that he was already liquidating his CSDX position.

**D. Defendant's Concealed Sales and False Account Statement (January to March 2025)**

34. On January 2, 2025, CSDX shares traded at approximately $1.775. By February 3, 2025 the price was approximately $1.41; by March 13, 2025 it had fallen to approximately $0.17;

and by April 2025 it was below $0.30. That decline, of more than eighty percent, occurred during the period in which Defendant was secretly selling and before the April 2025 events described below. (Al Sayyed Decl. Ex. G at 1; Ex. N at 3.)

35. During the week of March 10, 2025, Plaintiff observed a substantial and unexplained increase in the trading volume of CSDX shares, accompanied by a sharp decline in the share price, without any corporate announcement or other known event to account for it. Plaintiff's Chief Financial Officer opened an internal investigation and contacted Plaintiff's shareholders, including Defendant, to identify the source of the selling.

36. Defendant confirmed to Plaintiff repeatedly, orally and in writing, that he had not sold any of his CSDX shares during the period from February 3, 2025 through March 13, 2025. On or about March 10, 2025, Defendant sent Plaintiff's Chief Financial Officer by WhatsApp an image purporting to be a Velocity Trade "Account Statement" showing that Defendant held 961,378 CSDX shares, and then deleted the message. (Al Sayyed Decl. Ex. D at 1.)

37. Plaintiff's DTC security position reports for February 3, February 19, March 7, March 10, and March 13, 2025 showed that the CSDX position of JPMCBNA, the DTC participant through which Velocity Trade cleared, had declined by 245,273 shares over that forty-day period, while the sales confirmed to Plaintiff by its shareholders for the same period totaled approximately 70,000 shares. To Plaintiff's knowledge, Defendant was the only CSDX shareholder whose shares cleared through JPMCBNA. (Al Sayyed Decl. Ex. F at line 16; Ex. D at 2.)

38. Because Defendant had assured Plaintiff that he was not selling, Plaintiff could not reconcile the decline in the JPMCBNA position with the shareholder confirmations and concluded, wrongly, that Velocity Trade must be short selling CSDX shares. On March 14, 2025, Plaintiff

sent Velocity Trade a written demand to cease short selling and transmitted its DTC analysis. (Al Sayyed Decl. Ex. E; Ex. D at 2.)

39. On March 15, 2025, Plaintiff's Chief Financial Officer met with Defendant in Dubai. At that meeting Defendant admitted that it had been his decision to instruct Velocity Trade to sell CSDX shares during the forty-day period; that those sales totaled approximately 324,031 shares and generated more than US $255,000; and that he had sold for personal reasons relating to his banking relationship with JPMorgan Chase. Defendant further acknowledged that the account information he had sent Plaintiff did not reflect his actual holdings.

40. On March 17, 2025, Plaintiff's Chief Financial Officer memorialized the meeting in an email to Defendant, copying Mr. Fahrhoefer and Williamson, recording Defendant's admission and the steps agreed upon, including that Defendant would "hold any and all sales of [his] shares to allow the market to react positively" and that the planned deposit of Defendant's unrestricted shares with a broker through Transfer Online would be placed "on hold with our Transfer Agent until further notice." Defendant did not dispute the contents of that email. (Al Sayyed Decl. Ex. G.)

41. Defendant thereafter provided Plaintiff a second image of his Velocity Trade position reflecting a balance of 675,969 CSDX shares. The difference between the 1,000,000 shares Defendant held at Velocity Trade before the forty-day period and the 324,031 shares he admitted selling is exactly 675,969 shares. The 961,378-share balance Defendant reported to Plaintiff on or about March 10, 2025 was therefore false when he reported it, and Defendant knew it was false because he alone controlled the account and had himself directed the sales. (Al Sayyed Decl. Ex. D at 1.)

42. Defendant's misrepresentations caused Plaintiff to accuse Velocity Trade, the broker serving Plaintiff's shareholders, of unlawful short selling. On March 17, 2025, Plaintiff wrote to Velocity Trade withdrawing its demand, explaining that the shares cleared through Velocity Trade had been sold at Defendant's request despite his assurances to the contrary, and apologizing. Plaintiff's relationship with Velocity Trade was damaged as a result. (Al Sayyed Decl. Ex. H.)

43. Defendant's concealed selling during this period also caused an existing shareholder to withdraw his shares from custody at another broker to protect his position, caused prospective investors who had been monitoring Plaintiff's progress to hold back, and blunted the market impact of Plaintiff's contemporaneous product announcement, as Plaintiff's Chief Financial Officer recorded in his March 17, 2025 email. (Al Sayyed Decl. Ex. G at 2.)

**E. Defendant's March 21, 2025 Written Commitment and Plaintiff's Release of DRS Request**

44. During the week of March 17, 2025, Plaintiff learned from Transfer Online that Defendant was pressing Transfer Online to release his CSDX shares to Velocity Trade without Plaintiff's consent. Consistent with the steps recorded in the March 17, 2025 email, Transfer Online held that request pending Plaintiff's instruction.

45. On March 21, 2025, at 5:00 p.m. United Arab Emirates time, Mr. Fahrhoefer and Plaintiff's Chief Financial Officer met with Defendant. At 5:19 p.m., Defendant sent an email with the subject line "Re: Authorization" and the heading "CSDX unrestricted common shares" to Mr. Fahrhoefer and Plaintiff's Chief Financial Officer, copying Nicole Vos and Jason Horne of Velocity Trade, Carolyn Hall of Transfer Online, and Williamson, stating: "As per our meeting today at 17:00hrs UAE time, I can confirm moving forward that before we choose to action a trade to achieve a certain monetary value, we will Cc you in any Sell Order Trade to Velocity Trade."

Defendant added that "[t]he above falls in line with the MEDUSA sale MOU and Settlement Agreements." (Al Sayyed Decl. Ex. J at 2.)

46. At 5:45 p.m. the same day, Plaintiff's Chief Financial Officer accepted that commitment in writing, replying to Defendant and the same recipients: "Thank you for confirming in writing that (Before) any selling order to be transacted by Velocity Trade, you will have us in Cc," and, in the same email, instructed Carolyn Hall of Transfer Online to transfer DRS request number P202506600205, covering 1,000,000 unrestricted CSDX shares, to Defendant's balance at Velocity Trade. (Al Sayyed Decl. Ex. J at 1.)

47. Plaintiff's release of the pending DRS request was given in exchange for, and in direct reliance on, Defendant's written commitment. Plaintiff would not have released the DRS request, and would not have continued to cooperate with Defendant's transfer requests, had Defendant not committed in writing to give Plaintiff advance notice of his sell orders. DRS request P202506600205 covered 1,000,000 unrestricted CSDX shares, and its release placed those 1,000,000 freely tradable shares in Defendant's brokerage account.

48. At no time after March 21, 2025 did Defendant copy Plaintiff on any sell order before causing a trade in CSDX shares to be executed.

**F. Defendant's Sales in Breach of His Commitment and the Collapse of CSDX Share Price**

49. On March 25, 2025, four days after his written commitment, the CSDX share price fell sharply. Asked by Plaintiff's Chief Financial Officer by WhatsApp whether he was selling shares, Defendant first declined to answer and then wrote: "Yes, we need money Mohammad and $14,000 is not enough. I've asked them to sell to achieve a certain amount and will send email once home." Defendant had not copied Plaintiff on any sell order before placing that instruction

with Velocity Trade. Plaintiff's Chief Financial Officer responded that Defendant's selling had driven the share price from $0.55 to $0.36 that day.

50. On March 26, 2025, Plaintiff, through counsel, demanded in writing that Velocity Trade immediately cease all selling activity by Defendant in CSDX shares. On March 27, 2025, Velocity Trade notified its clients holding CSDX that, effective immediately, it would cease all dealing in CSDX shares, that all outstanding CSDX orders were cancelled, and that all CSDX shares held in client accounts were to be transferred back to the transfer agent. (Al Sayyed Decl. Ex. L.)

51. Defendant did not return his CSDX shares to Transfer Online. On information and belief, based on Plaintiff's records and its DTC position reports, in or about April 2025 Defendant instead transferred his CSDX position to another brokerage firm in Europe whose CSDX positions clear through DTC participant The Bank of New York Mellon ("BANK OF NY").

52. Plaintiff's DTC security position reports show that the BANK OF NY position in CSDX stood at 1,620,326 shares as of April 21, 22, and 23, 2025, and had fallen to 1,279,310 shares as of April 28 and 29, 2025, a decrease of 341,016 shares, while the JPMCBNA position remained unchanged at 700,200 shares throughout. The same reports show declines in other participant positions during that week, reflecting sales by other holders as well. (Al Sayyed Decl. Ex. M.)

53. OTC Markets Group's weekly reports for CSDX show that trading volume, which had been negligible, rose to 221,951 shares on April 22, 2025, 649,122 shares on April 23, 2025, 656,551 shares on April 24, 2025, and 342,418 shares on April 25, 2025, for a total of 1,870,042 shares in the week ending April 25, 2025, followed by 624,898 shares in the week ending May 2,

2025. In total, 2,494,940 CSDX shares traded in the two weeks from April 21 through May 2, 2025. (Al Sayyed Decl. Ex. N.)

54. On April 22, 2025, Plaintiff announced by press release an independent valuation of the exclusive global distribution rights for MEDUSA, news that should have supported the share price. Instead, the CSDX share price fell from a closing ask of $0.2498 on April 21, 2025 to a fifty-two-week low of $0.05 on April 23, 2025, closed at $0.06 on April 25, 2025, and closed at $0.065 on May 2, 2025. (Al Sayyed Decl. Ex. N.)

55. Plaintiff does not allege that Defendant was the only seller of CSDX shares during the week of April 21, 2025. Plaintiff alleges, on information and belief, based on the contemporaneous 341,016-share decline in the BANK OF NY position, Defendant's admitted practice of instructing his broker to sell whatever quantity was needed "to achieve a certain amount," and his failure to give the notice he had promised, that Defendant sold a substantial block of CSDX shares during that period without notice to Plaintiff. Plaintiff will establish the quantity and timing of those sales through discovery of Defendant's brokerage records.

56. Separately, and independent of the April 2025 selling by other holders, Defendant's undisclosed liquidation from January through March 2025 was the leading cause of the collapse of the CSDX share price. That selling drove the price from approximately $1.775 on January 2, 2025 to approximately $0.17 by March 13, 2025, while Defendant assured Plaintiff that he was not selling, caused Plaintiff to misdirect its investigation at Velocity Trade, and destroyed the market confidence that left the stock exposed to the further collapse in April 2025. Plaintiff will support these allegations with the account-level transaction records obtained in discovery, the DTC position reports, and the OTC Markets trading data.

### G. Defendant's Repudiation of the Settlement Agreement and Waiver

57. On May 9, 2025, Defendant sent Mr. Fahrhoefer, at CS Interpharm, a "Letter Before Claim" in which Defendant described himself as "Mr. Luke Wilson of MEDUSA," asserted that CS Interpharm had breached its agreements with him, and demanded, within fourteen days, written confirmation of the "return of MEDUSA," including its United States entity, formulations, intellectual property, domains, email and social media accounts, and valuations, the closure of the United Kingdom entity, and the "[r]emoval of all MEDUSA links to CS Diagnostics Corporation," or, alternatively, payment of $794,252.15 or the retention of 2,000,000 CSDX shares freed of Rule 144 restrictions. (Al Sayyed Decl. Ex. O.)

58. On or about May 21, 2025, the Ounce Sachs website, ouncesachs.com, stated that MEDUSA was "founded by Ounce Sachs in 2019," displayed the valuation that CS Interpharm had commissioned, and published the following statement attributed to May 9, 2025: "Having agreed the sale of MEDUSA in March 2024, Ounce Sachs reclaimed ownership in May 2025 due to the buyer, a US listed Pharma Corp. breaching contractual obligations including defaulting and failure to list on Nasdaq from OTCQB within 12-months, significantly impacting sale proceeds US CSDX stock value from a confirmed $10.00 position by Dec 24." The website added that "Ounce Sachs is now focused on alternative acquisition offers." (Al Sayyed Decl. Ex. P at 1 to 2.)

59. On information and belief, Defendant, as the founder and controlling person of Ounce Sachs, personally directed and approved the publication of those statements.

60. Defendant also did not perform his own obligations under the Settlement Agreement. He never transferred the approximately £18,000 in Medusa UK Holding's Revolut account to CS Interpharm. That account, which was administered through Williamson's email address, was closed on April 28, 2025 with a zero balance, and Defendant did not forward the closure confirmation until July 29, 2025. (Al Sayyed Decl. Ex. X.)

61. On May 23, 2025, CS Interpharm sent Ounce Sachs a written demand to cease and desist from using the MEDUSA brand name, intellectual property, information, and data, and to remove all such material from www.medusaprotect.com, www.ouncesachs.com, and the @medusaprotect Instagram account. (Al Sayyed Decl. Ex. Q.)

62. On July 17, 2025, Plaintiff received through the contact form on the MEDUSA website, medusa-sdp.com, a message from a third party reporting that the sender had "had contact from an individual who is claiming to represent/own the 'Medusa' brand," that the individual had "a website which flaunts the brand as their own," and that the individual was "trying to use that as evidence of affordability for a purchase through us." On information and belief, based on the content of the Ounce Sachs website, the individual described in that message is Defendant.

63. Notwithstanding the Settlement Agreement, the Waiver, and the May 23, 2025 demand, Defendant continues to display the MEDUSA name and product imagery on websites and social media accounts under his control in a manner that creates the false impression that Defendant owns, controls, or is affiliated with MEDUSA and that Plaintiff and CS Interpharm lack lawful rights in it.

64. Defendant's repudiation of the sale and Waiver within three months of signing them, his public statements that a "US listed Pharma Corp." had defaulted, and his marketing of MEDUSA as available for "alternative acquisition offers" cloud Plaintiff's exclusive United States rights, have caused actual confusion in the marketplace, and are further evidence that Defendant did not intend to honor the representations and commitments through which he obtained CSDX securities.

**H. Defendant's Efforts to Free the 2,000,000 Restricted Shares and Related Proceedings**

65. Transfer Online has maintained a stop on the 2,000,000 restricted shares held in Defendant's Account No. 1246-026 and has identified this action as the basis for it. (Al Sayyed Decl. Ex. U, Compl. ¶ 42A.)

66. On February 17, 2026, while this action was stayed pending jurisdictional discovery, Defendant filed an Emergency Motion for Miscellaneous Relief, which the Court construed as a motion for injunctive relief under Federal Rule of Civil Procedure 65, seeking removal of the restrictive legend from the 2,000,000 restricted shares. Plaintiff opposed the motion. By Order dated March 20, 2026, the Court accepted the Magistrate Judge's findings and recommendation and denied the motion. See Dkt. Nos. 50, 53, 54, 57.

67. On April 30, 2026, Defendant sent Transfer Online a "Formal Demand for Legal Basis of Transfer Suspension, CSDX Shares (Account 1246-026)," again seeking release of the restriction. On May 5, 2026, Transfer Online responded that it would process a request for restriction removal and electronic transfer upon receipt of a stock power transmittal form with a medallion guarantee, a seller's Rule 144 representation letter, DRS instructions, a legal opinion acceptable to the issuer, and payment of its fee, after which the request would be submitted to the issuer for approval. Defendant rejected those conditions the same day and, on May 6, 2026, notified Transfer Online that he had commenced legal proceedings in Oregon. (Al Sayyed Decl. Ex. T.)

68. On May 17, 2026, Defendant, appearing pro se, filed a complaint against Transfer Online in the Circuit Court of the State of Oregon for the County of Multnomah, Case No. 26CV24781, seeking $345,840.00 in damages on theories of wrongful refusal to transfer and conversion of the same 2,000,000 restricted shares. In that complaint Defendant alleges that the shares "were issued pursuant to a Settlement Agreement dated February 17, 2025," attaches the

Settlement Agreement as his own exhibit, and acknowledges that Transfer Online identified this action as the basis for the stop on his account. Defendant has never tendered to Transfer Online the Rule 144 documentation and legal opinion required for removal of the restrictive legend. (Al Sayyed Decl. Ex. U.)

69. Defendant's premise that his shares "became eligible for transfer and sale in or about September 2025" assumes that a six-month holding period applied and that nothing more was required. Neither assumption is correct. Defendant acquired the 2,000,000 restricted shares from an affiliate of the issuer on March 25, 2025, so his holding period under Rule 144(d) began on that date, and the length of that period, six months or one year, turned on whether Plaintiff had by then been subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act for at least ninety days. Plaintiff's registration statement on Form 10 under Section 12(g) of the Exchange Act, filed in 2025, was still being amended in September 2025 (Amendment No. 1 was filed September 9, 2025) and thereafter (Amendment No. 2 in November 2025 and Amendment No. 3 on March 12, 2026). Resale under Rule 144 also requires satisfaction of the current public information condition of Rule 144(c), compliance with the limitations of Rule 144(i) applicable to issuers that have at any time been shell companies, and delivery to the transfer agent of a seller's representation letter and a legal opinion that the conditions of the rule are met. Defendant has never undertaken to satisfy any of those conditions, and he rejected them when Transfer Online identified them on May 5, 2026.

70. On February 23, 2026, Williamson, the co-beneficiary of the account designated in the Settlement Agreement and a copy recipient of Defendant's March 21, 2025 email, filed a pro se complaint against Plaintiff in the United States District Court for the District of Wyoming, *Williamson v. CS Diagnostics Corp.*, Case No. 2:26-cv-00092-SWS, alleging that Plaintiff owed

her $93,000.00 under a "Consultancy Agreement" on March 25, 2025, that a partial payment of $14,010.00 was made, and that $78,990.00 remains unpaid. The $93,000.00 figure and the March 25, 2025 due date are the sum and date set out in the Settlement Agreement between Defendant and CS Interpharm. Plaintiff's Chief Financial Officer, whom Williamson alleges negotiated the Consultancy Agreement on Plaintiff's behalf, did not do so; no officer of Plaintiff authorized any such agreement; and Plaintiff has no record of it. On information and belief, the document is not authentic. (Al Sayyed Decl. Exs. R, S.)

### I. Harm to Plaintiff

71. Defendant's conduct has caused Plaintiff substantial harm, including: (a) the transfer and release of CSDX securities that Plaintiff, as issuer, would not have authorized had it known the truth; (b) the loss of Plaintiff's relationship with Velocity Trade; (c) the withdrawal of an existing shareholder's position from custody and the loss of prospective investors who had been monitoring Plaintiff's progress and who held back as the share price collapsed without explanation; (d) the impairment of Plaintiff's ability to use its securities to raise capital and to pursue its announced strategy in the United States market; (e) marketplace confusion concerning the ownership of MEDUSA and Plaintiff's rights in it; and (f) the expense of investigating Defendant's conduct and responding to the proceedings described above.

## V. CAUSES OF ACTION

### COUNT I: VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 (INJUNCTIVE AND DECLARATORY RELIEF)

72. Plaintiff incorporates the foregoing paragraphs.

73. Section 10(b) of the Exchange Act and Rule 10b-5 make it unlawful, in connection with the purchase or sale of any security, to employ any device, scheme, or artifice to defraud; to

make any untrue statement of a material fact or to omit a material fact necessary to make the statements made not misleading; or to engage in any act, practice, or course of business which operates as a fraud or deceit upon any person.

74. Defendant employed a scheme to defraud, made untrue statements of material fact, and engaged in a course of business that operated as a fraud, in connection with his own sales of CSDX securities into the United States over-the-counter market and with the transfer and release of CSDX securities to him. Specifically, Defendant (a) represented during the negotiation of the Settlement Agreement that he intended to hold the CSDX shares to be delivered to him for a long period, while he was already liquidating his position and intended to continue doing so; (b) represented on or about March 10, 2025 that he continued to hold 961,378 CSDX shares and had not sold any, when he had sold approximately 324,031 shares, and transmitted an account statement that did not reflect his actual holdings; and (c) represented in writing on March 21, 2025 that he would copy Plaintiff on any sell order before trading, a commitment he had no intention of honoring, as shown by his sale four days later "to achieve a certain amount" and his continued undisclosed sales thereafter.

75. Each of those statements was material. They concerned the size and stability of a 3,000,000-share position in a thinly traded security with approximately 9,000,000 shares held through DTC, and they were made for the purpose of obtaining, retaining, and freeing CSDX securities for sale while concealing that the holder was selling. The deception coincided with, and was the means of accomplishing, Defendant's sales of CSDX securities and his acquisition of additional CSDX securities.

76. Defendant acted with scienter. He personally controlled his brokerage account and directed every sale; he knew that the balance he reported was false; he admitted on March 15, 2025

that he had sold while denying it; he sold within four days of his March 21, 2025 written commitment; his stated motive was that "we need money"; and within three months of obtaining the shares he repudiated the Settlement Agreement and Waiver through which he obtained them. Taken together, these facts give rise to a strong inference that Defendant acted knowingly or, at a minimum, with severe recklessness.

77. Defendant's conduct involved the use of the means and instrumentalities of interstate commerce, including email and messaging communications with Plaintiff and Transfer Online in the United States, and sales executed and settled through United States market and clearing facilities.

78. Plaintiff is the issuer of the securities that are the subject of Defendant's scheme, and it seeks only equitable relief under this Count. The purchaser-or-seller limitation recognized in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), governs private actions for damages; the Fifth Circuit has recognized that strict insistence on a purchase or sale is not as critical where injunctive relief is sought. *Davis v. Davis*, 526 F.2d 1286, 1289 (5th Cir. 1976). Plaintiff has a direct and personal interest in the integrity of the market for its own securities, which Defendant's deceptive sales have damaged and which his continuing efforts to free and sell the 2,000,000 restricted shares threaten to damage again. Plaintiff also authorized the transfer and release of CSDX securities to Defendant, as issuer, in reliance on the deception alleged.

79. Defendant's violations are continuing and are likely to recur. Defendant holds 2,000,000 restricted CSDX shares, is pressing in two forums for their release, has repudiated the commitments through which he obtained them, and has demonstrated that when he holds salable CSDX shares he will misstate his position and sell whatever quantity he needs without notice.

Plaintiff has no adequate remedy at law for the harm to the market for its securities that a repetition of that conduct would cause.

80. Plaintiff is entitled to a permanent injunction, upon the showing required by law, (a) restraining Defendant from making any untrue statement of material fact, or omitting any material fact, to Plaintiff, Transfer Online, any broker-dealer, or any clearing agency concerning his holdings of, or transactions in, CSDX securities; (b) restraining Defendant from selling or causing the sale of CSDX securities without first giving Plaintiff the advance notice required by his March 21, 2025 commitment; and (c) restraining Defendant from obtaining, or attempting to obtain, removal of the restrictive legend on the 2,000,000 restricted shares by means of any untrue statement of material fact or material omission to Transfer Online, any broker-dealer, or any attorney asked to render a Rule 144 opinion. Plaintiff further seeks a declaration that Defendant's conduct described above violated Section 10(b) and Rule 10b-5.

**COUNT II: BREACH OF CONTRACT (THE MARCH 21, 2025 AGREEMENT)**

81. Plaintiff incorporates the foregoing paragraphs.

82. On March 21, 2025, Plaintiff and Defendant entered into a binding agreement evidenced by their emails of that date. Defendant offered, in writing, that before he caused any sell order for CSDX shares to be executed through his broker he would copy Plaintiff on the order. Plaintiff accepted that offer in writing the same day. In exchange for Defendant's promise, Plaintiff released the pending DRS request that it had held at the transfer agent since March 17, 2025 and continued to cooperate with Defendant's transfer requests. Plaintiff was not otherwise obligated to release the DRS request at that time, and its release was valuable consideration for Defendant's promise.

83. The essential terms of the agreement are definite: Defendant would give Plaintiff advance written notice, by copying Plaintiff on the sell order, before any sale of his CSDX shares.

84. Plaintiff fully performed.

85. Defendant breached the agreement on March 25, 2025, when he instructed Velocity Trade to sell CSDX shares "to achieve a certain amount" without copying Plaintiff on the order, and he breached it again on each occasion thereafter, including in April 2025, when he caused CSDX shares to be sold without advance notice to Plaintiff.

86. Defendant's breaches proximately caused Plaintiff actual and consequential damages, including the harm described above, in an amount to be proven at trial.

87. Plaintiff seeks its reasonable and necessary attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code, to the extent that statute applies, and under any other applicable law.

**COUNT III: PROMISSORY ESTOPPEL (IN THE ALTERNATIVE TO COUNT II)**

88. Plaintiff incorporates the foregoing paragraphs. This Count is pleaded in the alternative, to the extent the Court determines that the March 21, 2025 agreement is not enforceable as a contract.

89. Defendant promised, in writing, to copy Plaintiff on any sell order before causing a trade in CSDX shares to be executed.

90. Defendant made that promise to induce Plaintiff to release the pending DRS request and to continue cooperating with his transfer requests, and he knew or reasonably should have known that Plaintiff would rely on it. Plaintiff's Chief Financial Officer stated his reliance in the same email chain, and Defendant did not object.

91. Plaintiff relied on the promise to its detriment by releasing the DRS request and continuing to cooperate with Defendant's transfer requests.

92. Plaintiff's reliance was reasonable, foreseeable, and substantial, and injustice can be avoided only by enforcing Defendant's promise and awarding Plaintiff its reliance damages.

## COUNT IV: COMMON-LAW FRAUD AND FRAUDULENT INDUCEMENT

93. Plaintiff incorporates the foregoing paragraphs.

94. Defendant made material representations of existing fact to Plaintiff that were false when made: that he had not sold any CSDX shares between February 3 and March 13, 2025, and that he held 961,378 CSDX shares as of on or about March 10, 2025.

95. Defendant also made promises of future performance with no intention of performing them: his representation during the negotiation of the Settlement Agreement that he intended to hold the CSDX shares for a long period, and his March 21, 2025 commitment to copy Plaintiff on any sell order before trading. Defendant's intent not to perform is shown by his undisclosed sales before and during the negotiation of the Settlement Agreement, his sale four days after the March 21, 2025 commitment, his stated need for money, and his repudiation of the Settlement Agreement within three months of signing it.

96. Defendant knew the representations were false when he made them, or he made them recklessly, as positive assertions, without knowledge of their truth.

97. Defendant made the representations with the intent that Plaintiff act on them, and Plaintiff did so: it authorized, as issuer, the transfer of CSDX shares to Defendant; it directed its accusation of short selling at Velocity Trade rather than at Defendant; it released the pending DRS request; and it refrained from taking protective measures with respect to Defendant's shares that it would otherwise have taken.

98. Plaintiff's reliance was actual and justifiable, and Plaintiff suffered injury as a direct and proximate result.

99. Defendant's conduct was intentional, knowing, and fraudulent. Plaintiff is entitled to recover its actual damages and, under Chapter 41 of the Texas Civil Practice and Remedies Code or other applicable law, exemplary damages.

## COUNT V: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

100. Plaintiff incorporates the foregoing paragraphs.

101. There was a reasonable probability that Plaintiff would have entered into business relationships with prospective investors who were monitoring Plaintiff's progress in early 2025, with Velocity Trade and other broker-dealers serving Plaintiff's shareholders, and with distributors and commercial counterparties for MEDUSA in the United States under Plaintiff's exclusive license.

102. Defendant intentionally interfered with those prospective relationships by independently tortious and unlawful conduct: the securities fraud and common-law fraud alleged above, and his false public assertions that he owns MEDUSA, that Plaintiff lacks rights in it, and that MEDUSA is available for "alternative acquisition offers."

103. Defendant acted with a conscious desire to prevent those relationships from occurring, or with knowledge that interference was substantially certain to result, including by directing his statements at the market for CSDX securities and at counterparties for MEDUSA.

104. Defendant's interference proximately caused Plaintiff actual harm, including the loss of prospective investment, the loss of Plaintiff's relationship with Velocity Trade, and the

marketplace confusion reflected in the July 17, 2025 communication, in an amount to be proven at trial.

**COUNT VI: DECLARATORY JUDGMENT (28 U.S.C. §§ 2201 TO 2202)**

105. Plaintiff incorporates the foregoing paragraphs.

106. An actual, substantial, and continuing controversy exists between Plaintiff and Defendant concerning (a) Defendant's claimed rights in MEDUSA, which Defendant sold in March 2024 and waived in February 2025 but has publicly "reclaimed" and offered for acquisition since May 2025, in derogation of the exclusive United States rights that Plaintiff holds under its license and is authorized by Section 8.1 of that license to enforce; (b) the continuing force of Defendant's March 21, 2025 commitment; and (c) the conditions under which the restrictive legend on the 2,000,000 restricted shares may be removed, a question Defendant has placed before this Court, before Transfer Online, and before the Oregon court.

107. Plaintiff requests a declaration that:

(a) Defendant sold all of his right, title, and interest in MEDUSA and its related companies, brand, trademarks, social media, and assets to CS Interpharm and, by the Waiver, released and relinquished any and all claims of ownership, current or future, in them;

(b) Defendant holds no right, title, or interest in MEDUSA superior or adverse to the exclusive United States rights held by Plaintiff, and Defendant has no right to represent to third parties that he owns or controls MEDUSA or that Plaintiff lacks lawful rights in it;

(c) Defendant's March 21, 2025 commitment to give Plaintiff advance notice, by copy of the sell order, before causing any sale of his CSDX shares is a binding obligation that remains in force; and

(d) the 2,000,000 restricted CSDX shares held in Defendant's Transfer Online Account No. 1246-026 are restricted securities whose restrictive legend may be removed only upon satisfaction of the conditions of Rule 144 under the Securities Act of 1933 and Transfer Online's customary requirements for legend removal, including a medallion-guaranteed stock power, a seller's representation letter, and a legal opinion reasonably acceptable to the issuer; that Defendant's holding period under Rule 144(d) began on March 25, 2025, when he acquired the shares from an affiliate of the issuer; that Plaintiff, as issuer, acts within its rights in requiring those conditions, including a legal opinion addressing Rule 144's holding-period, current-information, and shell-company requirements, before approving removal of the legend; and that neither the Court's denial of Defendant's construed Rule 65 motion nor the pendency of Defendant's Oregon action entitles Defendant to removal of the legend outside that process.

108. Plaintiff further requests such additional relief, based on the declaratory judgment, as may be necessary or proper under 28 U.S.C. § 2202.

**COUNT VII: UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST (IN THE ALTERNATIVE)**

109. Plaintiff incorporates the foregoing paragraphs. This Count is pleaded in the alternative to Counts II through IV, to the extent the Court determines that no enforceable contract or statutory remedy governs the benefits described below.

110. Defendant obtained and retained valuable benefits from Plaintiff, including the release of CSDX securities into his brokerage account and the continued cooperation of Plaintiff, as issuer, with his transfer requests, through fraud, duress, or the taking of an undue advantage, as alleged above.

111. It would be unconscionable for Defendant to retain those benefits. Plaintiff is entitled to restitution and to disgorgement of the proceeds of Defendant's sales of the CSDX shares released to him through the conduct alleged, and to the imposition of a constructive trust over those proceeds.

## VI. CONDITIONS PRECEDENT

112. All conditions precedent to Plaintiff's claims for relief have been performed, have occurred, or have been waived or excused.

## VII. DAMAGES, EQUITABLE RELIEF, AND RESERVATION

113. Plaintiff seeks all damages legally recoverable and supported by the evidence, including: (a) actual and direct damages; (b) reliance and benefit-of-the-bargain damages; (c) consequential damages; (d) restitution and disgorgement; (e) exemplary damages to the extent permitted by law; (f) reasonable and necessary attorneys' fees to the extent recoverable by statute or other applicable law; (g) costs of court; and (h) prejudgment and post-judgment interest at the highest lawful rate.

114. Plaintiff further requests permanent injunctive relief, upon the showing required by law, (a) as requested in Count I; (b) enjoining Defendant and all persons acting in concert with him from representing to any person that Defendant owns, controls, or has reclaimed MEDUSA or that Plaintiff or CS Interpharm lack lawful rights in it; and (c) enjoining Defendant from selling,

or causing the sale of, CSDX shares without first giving Plaintiff the advance notice required by his March 21, 2025 commitment.

115. Plaintiff files this Second Amended Verified Complaint pursuant to, and within the scope of, the Court's Order of July 30, 2026 (Dkt. No. 64). To the extent the Court determines that any allegation or claim in this pleading exceeds the scope of that Order, Plaintiff respectfully requests leave to amend under Federal Rule of Civil Procedure 15(a)(2). Plaintiff further reserves the right to seek leave to amend as discovery proceeds, including discovery of Defendant's brokerage and bank records, which are in Defendant's exclusive possession.

## VIII. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff CS Diagnostics, Corp. respectfully requests that the Court enter judgment in its favor and against Defendant Luke Wilson:

a. awarding Plaintiff its actual, reliance, benefit-of-the-bargain, and consequential damages;
b. entering the injunctive and declaratory relief under Section 10(b) of the Exchange Act and Rule 10b-5 requested in Count I;
c. awarding restitution and disgorgement and imposing a constructive trust as requested in Count VII;
d. awarding exemplary damages;
e. entering the declaratory relief requested in Count VI;
f. entering the permanent injunctive relief requested above;
g. awarding Plaintiff its reasonable and necessary attorneys' fees to the extent recoverable by law;
h. awarding prejudgment and post-judgment interest at the highest lawful rate;

i. awarding Plaintiff its costs of court; and

j. granting Plaintiff all other relief, at law or in equity, to which it may be justly entitled.

**DATED AUGUST 21, 2026.**

Respectfully submitted,

**AMS LAW GROUP, PLLC**

By: /s/ Sam Almasri
Sam Almasri
State Bar No. 24053071
811 S. Central Expressway, Suite 600
Richardson, Texas 75080
Telephone: (469) 712-2906
sam@amslawgrp.com

**ATTORNEYS FOR PLAINTIFF**
**CS DIAGNOSTICS, CORP.**

## VERIFICATION

This Second Amended Verified Complaint is verified by the Declaration of Mohammad Salah Al Sayyed (known in business correspondence as Mohammad Essayed), Vice President and Chief Financial Officer of Plaintiff CS Diagnostics, Corp., made under penalty of perjury pursuant to 28 U.S.C. § 1746 and filed herewith together with Exhibits A through X.

## CERTIFICATE OF SERVICE

I certify that on August 21, 2026, the foregoing document and the Declaration of Mohammad Salah Al Sayyed, with exhibits, were filed through the Court's CM/ECF system, which will serve notice on all counsel of record, and were served on Defendant Luke Wilson, appearing pro se, by email at lwilson@ouncesachs.com and by the means of service on file with the Court, in accordance with Federal Rule of Civil Procedure 5(b).

/s/ Sam Almasri
Sam Almasri